THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* SCOTT WILLIAM DARNELL, Defendant-Appellant.

Third District    No. 80-170

Opinion filed March 18, 1981.—Rehearing denied May 8, 1981.

Robert Agostinelli and Stephen Omolecki, both of State Appellate Defender's Office, of Ottawa, for appellant.

Jeffrey W. O'Connor, State's Attorney, of Cambridge, for the People.

Mr. JUSTICE BARRY delivered the opinion of the court:

Defendant Scott Darnell was 16 years old when he was found guilty, following a bench trial, of the rape and murder of 10-year-old Vickie Larson. The court imposed a sentence of life imprisonment for the murder and a concurrent sentence of 30 years' imprisonment for the rape conviction. Defendant appeals from the rape conviction and from the life sentence.

According to the record on appeal, during the night of July 12, 1979, a search was begun for two missing persons: Scott Darnell, then 15 years old, and Vickie Larson, 10 years old. At 6:30 a.m. on July 13, Darnell was discovered along a country road near Andover, Illinois. He told police officers that he was the person they were looking for and said that he had been beaten up by two men on motorcycles and that was the last he had seen of Vickie. Darnell was taken into police custody, and in the afternoon of the same day he confessed to raping and murdering Vickie. Police obtained a tape recording and a written statement of his confession.

Darnell stated that he had been "going with" Vickie's older sister, Shelly, during the summer; however, as time went on, he started liking Vickie more. Three or four days before July 12, he took a shovel from his grandfather's tool shed and went into a cornfield, where he dug a hole in a small clearing. He said, "[F]or the next three days I tried to talk myself out of it. I knew what I was going to do." Then on July 12 during the day, he went to the Larson home and told the girls that he had gifts for them that he would give them at the baseball game that night. Shelly was not going to the game, so he said he would give them to Vickie. About 7:30 p.m., at the game, he told Vickie he had bought her an Arabian colt. He took her to the cornfield on the pretense that she could see the horse there and ride it. He stated, "[W]e just kept getting closer and closer and finally we got to where the hole was and I raped her and afterwards we went in the cornfield and I was in back and she was in front and I got out my bandana and put it around her neck and strangled her." Then he put her body in the hole and covered it with dirt, using his hands. By then it was getting dark. He ran through some fields, and finally he slept in a bean field. He woke up in the morning and was starting to go to his grandmother's house when he was stopped by officers searching for the missing girl and was arrested.

Shortly after Darnell's arrest and before his confession, the grave was discovered by another party of searching police. The grave was located in the cornfield and shoe prints were clearly visible in the loose dirt. Investigating officers uncovered the body of Vickie Larson. A photograph of the body before its removal from the grave shows the soil partially removed. The girl was clothed in a short sleeve print top, red shorts and had bare feet. The shorts were pulled down just below her buttocks. Later Darnell led officers to where he had buried his red bandana and to the shed where he had taken his grandfather's shovel used to dig the hole.

When defendant was first arrested, his clothing was removed for forensic processing and his body was photographed. A picture of his genital area was introduced in evidence, without objection, for the stated purpose of corroborating defendant's confession. The photograph shows red marks on the tip of the penis that appear to be abrasions. The

photograph was taken between 11 a.m. and 12:45 p.m. on July 13, 1979. In addition, his tennis shoes matched the shoe print on the surface of the grave.

On the date of Darnell's arrest, the State filed a juvenile petition alleging that he was delinquent in that he had committed the offenses of murder and rape. Later the State filed a motion seeking to prosecute defendant as an adult, and the motion was allowed. Thereafter, a two-count information was filed on July 24, 1979, charging defendant with the offenses of murder and rape.

Defendant asserted the affirmative defense of insanity, and as a consequence the court heard extensive psychiatric testimony and details pertaining to defendant's social history. Defendant had witnessed and participated in sexual activities from the time he was five years old. His mother died when he was seven, and he then lived with his adoptive father, Robert Darnell. When defendant was 10 years old, he attacked a 7-year-old girl and was referred to the Department of Children and Family Services. Beginning in 1974 when he was 10 years old, defendant received treatment at various mental health facilities including Galesburg, Tinley Park, and Chicago, and had resided in numerous institutions, including Bethany Home in Moline and Covenant Children's Home in Princeton.

Defendant's sordid history of criminal activity includes an armed robbery in Rock Island in 1975, an attack upon a 10-year-old girl in 1977 which resulted in juvenile proceedings, and in 1978, felony charges of unlawful restraint and forcible detention arising out of an incident where he held a male victim hostage at gunpoint. After this occurrence, he was committed to the juvenile division of the Department of Corrections. In May of 1979 he was released by the Department of Corrections for residence with his grandparents in Andover, Illinois. Department records indicate that his parole eligibility would be considered in July of 1979. Without attempting to describe defendant's mental health history or his history of criminal conduct in detail, it can be fairly said that the lawful authorities of the State of Illinois provided extensive social, medical, and psychiatric treatment and tried numerous institutional settings in an effort to rehabilitate defendant.

At trial the defense called two psychiatrists who had treated defendant in the past. Both indicated that he was a paranoid schizophrenic. One doctor, who had interviewed defendant again after the present charges were filed, thought that he was not capable of conforming his conduct to the requirements of law and thus was legally insane at the time of the crime. The second doctor stated, in answer to a hypothetical question, that defendant did have a substantial ability to appreciate the nature of his acts and also the ability to control himself. According to

defense counsel, this conclusion expressed by his second expert witness was a surprise to counsel and was contrary to a previous statement by the doctor.

The psychiatrist called by the State testified that defendant was not psychotic, that he was in touch with reality, that he had tried to hide his crime, and that he would not have committed the crime had a policeman been present, thus indicating that he could control his conduct. This doctor also recounted defendant's statement to him that he knew what rape was, that he had previously had sexual intercourse that was not rape, that when he raped Vickie he had no trouble entering her, but he did not ejaculate and lost his erection when he withdrew his penis. This doctor, as well as the other experts, noted that defendant associated sex with violence due to his childhood experiences.

The pathologist who performed the autopsy upon the victim's body, testified that he had no opinion "one way or the other" as to whether or not she had been raped. He found no evidence of injury to the genitalia or of presence of sperm although he did not do a sperm test. He stated that rape could not be ruled out on the basis of his findings.

At the conclusion of the bench trial, the court found defendant guilty of rape and murder. Following a presentence investigation and a sentencing hearing, the court imposed a sentence of life imprisonment for murder and a concurrent sentence of 30 years imprisonment for rape. In announcing sentence, the court stated:

"The particular evidence, information, factors, or other reasons that lead to my sentencing determination are specified as follows: One, the defendant's conduct caused death. Two, defendant has a history of prior delinquency. Three, the sentence is necessary to deter others. Four, the evidence is that the defendant approached the ten year old victim from the rear, placed a bandana handkerchief around her neck and strangled her. He continued strangling her until he was sure she was dead, and then dragged her to a shallow grave previously dug by him and covered her body with dirt. I find such behavior to be exceptionally brutal or heinous and indicative of wanton cruelty. Five, the evidence is that the defendant raped the ten year old girl. He then released his victim. The girl walked a short distance from the scene of the rape. The defendant followed her and killed her by strangulation intentionally or with the knowledge that his acts created a strong probability of death. I conclude that the victim was killed in the course of another felony, and that such felony was rape. Six, the information and evidence is that the defendant is likely to commit another crime, and that he is a danger to the public."

Defendant has appealed from the conviction and sentence for rape and from the life sentence for murder as aforesaid.

Defendant's first contention is that he was not proven guilty of rape beyond a reasonable doubt because the only evidence tending to show that a rape occurred was defendant's confession. In Illinois it is a well-established rule that a naked uncorroborated confession is insufficient to convict. (*People v. Lueder* (1954), 3 Ill. 2d 487, 121 N.E.2d 743; *People v. Linkogle* (1977), 54 Ill. App. 3d 830, 368 N.E.2d 1075.) The Illinois Supreme Court has observed:

> "We agree with defendant that admissions cannot alone establish the *corpus delicti*. However, this does not mean that the *corpus delicti* must be proved by evidence, aside from the confession, beyond a reasonable doubt. Direct and positive evidence is unnecessary to prove the *corpus delicti* and it is sufficient if other evidence so corroborates the confession or admission as to show the commission of the offense beyond a reasonable doubt." *People v. Pry* (1967), 38 Ill. 2d 261, 263, 230 N.E.2d 825, 826.

In the case at bar defendant points to the absence of any indication of genital trauma to the victim and to the likelihood that defendant's confession was unreliable as supporting his contention that the confession was insufficiently corroborated. Obviously, the absence of certain evidence does not establish the lack of other possible corroborative evidence. According to the record, while the pathologist who performed the autopsy found no indications of injury to the victim's genitalia, he expressly stated that he could not rule out the possibility of rape. In view of the many possible inferences that can be drawn from the pathologist's testimony, we cannot say that his testimony was conclusive of either the occurrence or the nonoccurrence of rape.

■■ Defendant also claims that the confession was unreliable, particularly in view of his mental state and the manner the police used in conducting the interview. These are factors that go to the weight to be given to the confession by the trier of fact, not its admissibility. Actually, the general unreliability of confessions has often been stated as the rationale behind the rule requiring independent corroboration of the confession. (*E.g., People v. Holmes* (1976), 38 Ill. App. 3d 122, 347 N.E.2d 407.) Here we have carefully examined the record, and we find that the rape conviction was proven beyond a reasonable doubt. Two exhibits tend to corroborate the confession: the photograph of defendant's genitalia showing apparent penile abrasions and the photograph of the partially exhumed body of the victim showing her shorts pulled down below her buttocks. The evidence was sufficient to sustain the conviction, and the trial court did not err.

Defendant challenges on several grounds the propriety of the sen-

tence of natural life imprisonment for the offense of murder. Section 5—8—1 of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—1(a)(1)) authorizes imposition of a life sentence "if the court finds that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty or that any of the aggravating factors listed in subsection (b) of Section 9—1 of the Criminal Code of 1961 are present * * *." Section 9—1(b) of the Criminal Code lists seven aggravating factors. In the instant case, the trial judge expressly found that two aggravating factors were present: (1) that the murder was accompanied by exceptionally brutal or heinous behavior and was indicative of wanton cruelty and (2) that the victim was killed in the course of another felony, *i.e.*, rape.

Defendant argues that, if the rape conviction is reversed, then the life sentence should be vacated and the cause remanded for resentencing because one of the aggravating factors will no longer apply. Since we affirm the rape conviction, this argument is moot.

Defendant next argues that the trial court erred in determining that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. The imposition of a sentence, including an extended-term sentence, has often been held to be a matter of judicial discretion which may not be altered upon review unless there was an abuse of that discretion. *E.g.*, *People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882; *People v. Warfel* (1979), 67 Ill. App. 3d 620, 385 N.E.2d 175.

More recently the Illinois Supreme Court, when confronted with an excessive sentence issue, stated:

> "This court will not disturb a sentence imposed by the trial court unless it clearly appears that the penalty constitutes a great departure from the fundamental law and its spirit and purpose. In this State, the spirit and purpose of the law are upheld when a sentence reflects the seriousness of the offense and gives adequate consideration to the rehabilitative potential of the defendant." *People v. Carlson* (1980), 79 Ill. 2d 564, 587, 404 N.E.2d 233, 243.

The requirement of the life sentence statute that the murder be "accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty" has twice been upheld against attacks upon its constitutionality. (*People v. Merchel* (1980), 91 Ill. App. 3d 285, 414 N.E.2d 804; *People v. Nobles* (1980), 83 Ill. App. 3d 711, 404 N.E.2d 330.) In *Merchel*, the court said:

> "[T]he terms of the statute provide a 'meaningful basis for distinguishing the few cases in which the penalty is imposed from the many cases in which it is not.' Thus the provision is not unconstitutionally vague, but gives reasonable guidance and is designed to

avoid arbitrary and discriminatory enforcement." 91 Ill. App. 3d 285, 294, 414 N.E.2d 804, 811.

■■ In the case at bar, defendant claims that the circumstances of this murder were not more brutal or heinous than most other murders since the victim was not tortured, molested or mutilated. However, the act of raping the victim could certainly be considered a form of molestation. Promising his 10-year-old victim a horse, defendant lured her to the site of a previously prepared grave, and there he raped her. As she started to go away from him, he followed her, strangled her from behind with his bandana, put her body in the grave, and covered it with dirt. In our view, the trial court quite properly found that defendant's conduct came within the purview of the life sentence statute.

Defendant has cited the United States Supreme Court decision in *Godfrey v. Georgia* (1980), 446 U.S. 420, 64 L. Ed. 2d 398, 100 S. Ct. 1759, in support of his argument that this crime was not sufficiently heinous or brutal to warrant imposition of a life sentence. In that case, a divided court reversed a death sentence because the circumstances surrounding the double homicide did not comply with the Georgia law requiring that the offense be "outrageously or wantonly vile, horrible or inhuman" so as to demonstrate depravity of mind or torture or an aggravated battery to the victim. The United States Supreme Court was considering whether the State of Georgia had met its constitutional responsibility to apply its capital punishment law in a manner that avoided the arbitrary and capricious infliction of the death penalty. The Supreme Court decided that the statute had been unconstitutionally applied under the circumstances of that case. The case before us involves different statutory language ("exceptionally brutal or heinous behavior indicative of wanton cruelty"), and while the analysis is helpful, we do not believe *Godfrey* compels a reversal here.

Defendant also contends that his life sentence was excessive and inappropriate because a life sentence completely rules out any possibility of his rehabilitation and return to useful citizenship. He insists that, at age 16, he is too young to be imprisoned for his natural life and that the legislature did not intend that everyone convicted of murder should be sentenced to prison for life. In *People v. LaPointe* (1980), 85 Ill. App. 3d 215, 407 N.E.2d 196, the appellate court reduced a life sentence to a term of 60 years because the 18-year-old defendant had been heavily involved in drug use and had not previously been an aggressive or violent person. The reviewing court noted that the trial judge did not consider the objective of restoring the defendant to useful citizenship at some time in the future, as required by article I, section 11, of the Illinois Constitution of 1970.

■■ ■ Unlike the defendant in *LaPointe*, there is no indication that

Darnell was involved with drugs or that he was motivated to kill because he needed funds to support a drug habit. There are numerous indications he is a violent and aggressive person and has been so since a very young age. He has been afforded repeated opportunities for treatment and rehabilitation but, instead of making progress toward useful citizenship, each time he was released he proved to be an ever-increasing danger to society. We believe the record of expert testimony clearly indicates that defendant has virtually no prospect of rehabilitation and that a life sentence is necessary for the protection of the public. Defendant's youthfulness is not alone sufficient to justify a reduction of sentence. "The nature of the crime, the protection of the public, deterrence and punishment have equal status in the consideration." (*People v. West* (1977), 54 Ill. App. 3d 903, 909, 370 N.E.2d 265, 270.) There is no evidence that medical science offers any hope that the adult Darnell will be less of a danger to little girls than he was as a youth. We, therefore, hold that under the special circumstances of this case, the imposition of a life sentence was not excessive or inappropriate.

With leave of this court, defendant has also filed an additional brief asserting that he was denied equal protection of the law because the statute which authorizes imposition of a life sentence for "exceptionally brutal or heinous behavior indicative of wanton cruelty" (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—1(a)(1)) applies to those under 17, while the extended-term sentencing provisions are limited to persons over 17 (Ill. Rev. Stat. 1979, ch. 38, par. 1005—5—3.2(b)(2)). We have examined the record and find that this issue was not raised in the trial court. "The rule is familiar that a nonjurisdictional question which has not been properly presented in the trial court and preserved for review will not be considered on appeal." (*People v. Amerman* (1971), 50 Ill. 2d 196, 197, 279 N.E.2d 353, 354.) The failure to challenge the constitutionality of a sentencing statute is waived if the argument is not advanced in the trial court. *People v. Butler* (1979), 78 Ill. App. 3d 809, 396 N.E.2d 1374; *People v. Robertson* (1976), 34 Ill. App. 3d 762, 340 N.E.2d 213. Contra, *People v. Merchel* (1980), 91 Ill. App. 3d 285, 291, 414 N.E.2d 804, 809.

■■ Even if this issue were not waived, we conclude that it need not be considered for another reason. Defendant contends that there is no rational basis for allowing a trial court to impose a life sentence upon a defendant who was 15 years old at the time of the crime and who was found guilty of a brutal and heinous murder, but not to allow the intermediate extended-term sentence of 40 to 80 years to a defendant under the age of 17 years who was guilty of a brutal and heinous murder. This argument ignores the fact that the trial court found an additional second aggravating factor in this case—that the murder was committed in the

course of another felony and that felony was rape. Thus the life sentence would be proper whether or not defendant's equal protection argument as to the brutal and heinous conduct provision were persuasive. Accordingly, we do not deem it appropriate to consider the additional issue.

For the reasons stated, we affirm the convictions and sentences imposed by the circuit court of Henry County.

Affirmed.

ALLOY, P. J., and STOUDER, J., concur.